Our next case for argument this morning is Sun Life Assurance Company v. Wells Fargo Bank. Mr. Dikens. Good morning, Your Honors. May it please the Court. I would like to focus my argument today on the two core questions at issue in this case. First, did the subject policy issued on the life of Robert Corwell have an insurable interest at the time it was issued? And second, in the alternative, is Wells Fargo entitled to a restitution of all premiums that it paid to keep that policy in force? Because the answers to both of these questions are yes, the judgment below must be reversed. The policy issued on Corwell's life had an insurable interest at the time it was issued because Robert Corwell alone and no one else owned and controlled the policy. Before you dive into that, can I ask, Counsel, a number of documents seem to be sealed in this case. Why is that? Your Honor, I believe things were initially filed under seal and then they were filed publicly subsequent to the initial filing. We've still got redacted versions of appendices. Should we just unseal everything? Your Honor, I think that everything is sealed according to the district court. The district court never unsealed anything. They were filed under seal in the district court, so they remain under seal. The question is, is there any good reason for that? Why? Why? Well, initially I think there were documents that both parties had marked confidential. These are transactions that occurred 15 years ago. I think both parties, I want to speak for Sun Life, they should, I don't think there's anything that's confidential in there, but I would. Thank you. Yeah, I'm not, I'm sorry, the answer escapes me on that. Your Honor, I think everything's been filed publicly. Did Mr. Corwell risk any money in this transaction? Your Honor, Robert Corwell personally did not risk any money in this transaction. He elected only after the policy was in force and only after he was the record owner at its inception. He elected to use what's called a non-recourse loan, meaning that the loan had no personal recourse to him individually. That was ahead of time, right? Because we have, your brief, very interestingly, skips from the application to the issuance of the policy in your account of the facts without any indication of all the things that had to be set up ahead of time for that policy to be issued. Including the commitment to reimburse him for the initial policy premium payment and AIG's pre-approval of the transaction. Well, your Honor, I want to, there's quite a bit in that question, so I'd like to unpack it for you. First, Robert Corwell had no pre-arranged agreement, no pre-arranged obligation, no contractual obligation to use any particular financing program. Wait a minute, it was my understanding that he was told in advance that if you make that initial premium payment, and we have a photocopy of that check somewhere in the massive number of appendices filed here, that he would be reimbursed for every last cent that he paid. And indeed, he was, immediately. And as you point out, and no one disputes, it was a non-recourse loan. So, to Judge Hamilton's question, he did not risk a penny in this transaction. He contributed his insurability, his actuarial profile, but there was no money. And so somebody had to decide that they were going to take on a $5 million, I assume this was a, this wasn't a term life policy. No, you're right. It was a whole life policy, sure. Somebody had to take on the risk of total non-payment, but it wasn't really a risk because what they wanted was for him not to pay. And they wanted the policy to revert back. Well, again, Your Honor, Robert Coel understood that he would be reimbursed if he entered into the loan transaction. But the day the policy is issued to him, he can do whatever he wants with the policy. No, we understand that, but the fact is he doesn't have to pay anything for the policy. He doesn't, Your Honor. To put this differently, you will concede that this policy was issued as part of an elaborate fraud cooked up between Coel and the trust and AIG? No, Your Honor, I will not concede that. No? No, because – I would have thought you would say of course this was a fraud. But once it got past the two-year incontestability point, the fraud can't be the basis for setting aside the policy. Well, that's true, Your Honor. Do you want to deny that there was any fraud here? A little puzzle. Your Honor, I didn't say that I deny there was fraud. I said I deny that there was some elaborate conspiracy between Robert Coel and – I didn't say the word conspiracy. I said fraud. There was fraud from beginning to end in the way this policy was set up. And the fraud wasn't discovered within the incontestability period. Now, we have to figure out what the consequence of that is. Well, Your Honor, the consequences are that any fraud must be – any fraud with respect to a policy on the application must be challenged within two years while the insured is alive. That didn't occur here. But a challenge based on lack of insurable interest is separate and distinct from a challenge based on fraud because insurable interest challenge is exempted from the incontestability statute. I don't see how there's any problem with Corwell having an insurable interest. Illinois law says if you buy the policy in your own name and own it for one day, you can sell it to anybody the next day. Sun Life said you can't. That's part of the fraud. But Coel had an insurable interest on the day he bought the policy. He was just defrauding Sun Life about what he was doing. Well, Your Honor, the application was silent as to whether premium financing would be used. It was left blank. So Sun Life could have investigated whether premium financing would be used, but that answer would – But there were a lot of misrepresentations in that application. I mean if Sun Life – And they were intentional and they were material, which is why they were fraud. Right. Well, Your Honor, there's no dispute that Corwell could have afforded to pay the premium himself and that he, again, like I said, could have used any number of financing programs to procure – I'm not sure that's completely undisputed. I mean he certainly could make the first payment because he did use some personal trust or something to make that payment on. But I recall that his financial advisor, whether it was his insurance broker or somebody, said at the clip with which premiums were due, if this had been a bona fide policy and he had kept it, he would have gone underwater. Well, the wisdom of paying off the loan is different from the ability to afford it, Your Honor, respectfully. He had the financial means – his accountant, John Burge, testified that he had $470,000 of income in 2006 and he had millions in his IRA account. So he could have afforded it if he wanted to. But as Judge Easterbrook points out, his intent was to use a nonrecourse loan to create a policy that he could later sell. But it is axiomatic under Illinois law that the intent to create a policy for later sale does not change the insurable interests that Robert Corwell had in his life. But Mr. Dikus, at bottom, isn't this case really the question whether we look only at the formalities, as you want us to, or whether we look beyond them to take Justice Holmes' phrase in Grigsby to – that is, looking to the substance, whether this was just a cloak. Your Honor, you should look at the form and the substance. They are identical in this case because under the terms – Oh, no, no, no. Look, all the forms were complied with except for the fraud, and that's outside the incontestability period. But the substance was not. This was never a serious policy. So the question Judge Hamilton is asking you, which I am asking you, which I will ask the other side, are there state insurance cases saying that substance trumps form when dealing with insurability? Question of Illinois law, not of what federal district courts have said. Hawley v. Edna Life Insurance is directly on point here because it says what the insured wants to do with a policy is irrelevant to the question of insurable interests. So if you consider whether – But that's not answering the question Judge Easterbrook just asked you. The question is do you look at the substance beyond the form? We all understand that you can sell an insurance policy if you're Mr. Corwell. Sure, you can sell it, but if it was part of this elaborate effort to create value for the holders of these policies where he – it wasn't really a bona fide sale. That's different, and the parties were citing to us a bunch of rather ancient Illinois cases. Your Honor – 1883, 1889 cases, and so one of these, the 1889 case, Cisna against Shibley, no insurable interest where the premium financiers used the insured as a mere tool or instrument to accomplish their scheme beyond which a court of equity will look to see what was the real contract. That sounds like language that we're going to look at the substance to me. Your Honor, you should look at the substance because the critical question to determine whether there's an unlawful wager under Illinois law is whether the insured or someone who lacked an insurable interest in his life owned or controlled the policy at the time it was issued or had the right to somehow own and control the policy. And if you examine the substance here of the loan, the terms of the loan itself, Robert Corwell owned and controlled the policy under the terms of his trust. He had the right under the trust instrument to name the initial beneficiary who would receive the policy proceeds in the event of his death. Nobody could change that without Robert Corwell's consent. Well, everybody gambled that he was going to hang on for two years before the planned turnover of this policy. Well, Your Honor – Well, actually, there was no risk for that. If he had died within the two-year period, the policy pays off, the loan gets paid off, right? The policy would go to the trust as the beneficiary. The loan would be repaid, and the money would go to Robert Corwell's wife. Right, right. But he basically gets 32 months' worth of free insurance, right? That's what he gets. His family gets $5 million of valuable insurance coverage for almost two years or almost three years. And to get back to Your Honor's point, again, under the loan terms, not AIG, not Coventry, no transaction participant could force Corwell to do anything. I would like to come back to the question that now all three of us have asked. Are there Illinois state cases, cases from the state's appellate judiciary, that talk about whether, and if so, when, it is permissible to go past form to look at substance in a transaction of this kind? Judge Wood mentioned one case. Do you have a response to that case? Do you have others you wish to bring to our attention? Well, I would point Your Honor's to – it's a little – just to be clear, Your Honor is asking about a transaction of this kind. Are you referring to a non-recourse loan transaction because there's no Illinois case? Well, I'm sorry. I should restate. How about a transaction in which everything is wired ahead of time to make sure that the policy will be transferred to the investors? Well, Your Honor, in Ohio National Life Insurance v. Davis, which is an appellate case from this court. Now, I asked you about state court cases. No state court case, Your Honor, that I'm aware of that we've discussed. So you don't think the case that's already been cited by Judge Wood is even relevant? Well, Your Honor, in that case, the investors controlled the policy. There's no Illinois case holding that where an insured owns and controls the policy at inception, the policy is an unlawful wager. There has to be – you have to examine the substance and determine whether a third party without insurable interest had an interest in the insured's early death. As I think Judge Wood pointed out, when this policy was issued, everybody wanted Robert Corwell to live. That's the same interest that Sun Life has, that an insured company has. But the sooner he died after the 24 months. That's right. But, Your Honor, respectfully, that is a lawful transaction. Insureds are free to buy and sell their policies. Yeah, yeah. We get that notion of legality based on the formalities being observed. I would reserve the rest of my time. Thank you, Your Honor. Certainly, Mr. Dikens. Mr. Kelleher, I bet you can tell where we would like you to start. What's your best Illinois case for the proposition that a court can look through the form to the substance of the transaction? Yes, Judge Easterbrook, and may it please the Court, thank you for that question and thank you for the opportunity. Judge Wood, you're exactly correct. The best case that we have on this is the CISNA case. And as it sounds like Your Honor knows, in that case, the court says that when we're analyzing these questions about insurable interest and wagering and whether it was a cover for a wager, that we, quote, look beyond the mere form of the transaction in question and consider their substance. That's the CISNA case at page 3. Yeah. Anything in the last two centuries? That's the 19th century. We've got the, right? Well, Your Honor's point is well taken as far as it goes. However, that case has never been overturned nor has it been reversed. And all of the other cases, although not quite as... At least it wasn't by the territorial court, right? It was shortly after statehood. Again, I understand your point, Your Honor. But I think I take from your response that you also understand mine, which is that case is still good law. And if we look at the other cases, though they don't use those exact words, form over substance, we see the same concept being sown throughout them. And that is there is no bright line test in Illinois. Is there anything one way or the other that might be in the statute? Illinois has got pretty elaborate insurance statutes. That's a great question, Your Honor, because unlike many states, Illinois does not have an insurable interest statute. In the mid-1900s, 1960, 1970, something like that, lots of states around the country adopted insurance statutes specifically codifying insurable interest rules. And there have been some arguments by investors in some cases... That much I understand. But I was asking a more general question. Is there any form versus substance clause in the Illinois insurance code? There is one, for example, in the Internal Revenue Code, although it's limited to piercing form to get at substance when the Internal Revenue Service itself tries to do that. Taxpayers aren't allowed to do it. Is there any similar clause in state insurance law? That's what I was asking. It's a fair question. It's not one that I have specifically looked at, so I'm not prepared to answer it at this moment. I'm happy to do so. That's a fair answer. Thank you, Judge. But I do think it's important to come back to the point that there are many, albeit old, Illinois state cases that say that it's a fact-sensitive approach. We look past the form to the substance. That's CISNA. And we ask was the policy taken out in good faith for a bona fide purpose or was the transaction merely structured by an investor to feign technical compliance with insurable interest principles to circumvent the law as a device, as an artifice. These are the words that are used as a cover to circumvent the law. And why that's important is grounded in reality, and that's this. Stoley promoters since the good old days have been constantly evolving their tactics. They're constantly trying to create transactions that are designed to make it look like, oh, maybe there's some technical way this is legit as a way to I understand, but that's why I was asking about the last two centuries. There are a lot of clever lawyers, and they've devised a lot of clever strategies to comply with the form but not the substance of insurance principles. And the fact that there has been nothing but silence from the Illinois judiciary for the 20th and 21st century is a little puzzling, is it not? Well, I suppose, Judge, we can read silence in any way we like. We certainly look at the silence as meaning this is the rule. It's never been questioned or challenged, and it remains the rule. And that is the rule that the district court correctly applied in our view here. And what is remarkable about Wells Fargo's briefing and their argument today is that Wells Fargo ignores almost everything that actually happened here. Wells Fargo ignores, for example, that Mr. Correll was solicited by Coventry, financially induced to participate, that life expectancy reports were generated on his life, that they were shared with their captive buyer AIG. And was that before the policy issued? Yes, it was. Yes, it was. And AIG preauthorized Coventry to move forward with the transaction also before the policy was issued. Also before the policy was issued, as numerous of the judges have pointed out, Coventry promised him in writing they would reimburse him dollar for dollar. There was never any risk to him. Okay. Yes, Judge. We know the facts that help you. Could you address the 2009 discovery by Sun Life of the fact that non-recourse financing had been used here? Why not take some action then? You continued to accept premiums, as Wells Fargo points out, for years after that. Yes, so I'm happy. And you want to keep them. I'm happy. So are you – have we moved to the premium question? Are we on the – No, I'm not exactly sure, but I'd like you to address the 2009 revelation. Very well. Or discovery. Yes, sir. And I would say that it wasn't anything close to a revelation. What happened in 2009 was Mr. Nelson put another application in for a third policy. With Sun Life for Corwell? Second policy with Sun Life. At this point, the third policy on Corwell. There were seven that were actually issued in total for over $25 million of insurance. At that time, the underwriters noted that the previous – the one we're talking about, this Sun Life policy, was financed by LaSalle and that it had ended up back with Coventry. That is the extent of what the record reveals that Sun Life knew at the time. It is not the case that Sun Life knew at the time the nefarious details that we uncovered through discovery in this case. We dug very deeply in discovery in this case. We issued 19 third-party fact subpoenas, eight depositions, and we took four sworn witness statements on top of that. In comparison, Wells Fargo, as securities intermediaries and investors do in these cases, did almost nothing. Why? Because they know. When you look at the substance, when you turn over the rocks, they know what we're going to find. On the question of validity. I think you answered my question about 2009, and it didn't convince you that things at that point were void. There was some debate in the last couple of briefs in this case about the rejection of the Welcome Funds offer in 2008. Can you tell us what the evidence shows, and perhaps Mr. Dikens might address this in rebuttal, about whether anybody told Mr. Corwell about that offer? Thank you, Judge.  Mr. Corwell's supposed helper or agent here was Mr. Nelson. But Mr. Nelson was also Coventry's agent. He had a signed agreement with them. So did the brokerage Highland Capital. Highland Capital supposedly— So this is all—it's clear from the deposition testimony that Corwell was not told? Yes, it is. And I don't believe that is contested, but you can ask Mr. Dikens. But it is clear from the deposition testimony. I read Wells Fargo's briefs, and it sounds like it was Mr. Corwell marketing his policy and making the decision to reject the offer. There's no evidence of that. That is their argument. Their argument is a very technical one. It is that because technically, upon the expiration of the loan, Mr. Corwell technically could have sold it to a different investor, provided Coventry didn't offer as much money, or technically could have paid off the loan, this usurious loan with his own money. And what would have had to have happened in the market for there to be a more generous offer for more than the loan? It's a great question. It's revealed by the very email I believe you're talking about, the 2009 email between Coventry and Mr. Villardo. What happens there is this. Mr. Villardo says, hey, Coventry, you ought to pay us $300,000 in excess of the loan for this policy. Coventry laughs. And they say your best offer, the welcome funds offer, was $30,000 over the loan. And then they say, how can you possibly think you're going to get $300,000? The guy's health hasn't changed. And that answers the question, Your Honor. Health. Health. And so these Coventry deals were essentially lottery tickets, right? The inducement was, hey, somebody else is going to take care of all the costs, shoulder all the risks, and on the back end, there might be some money in it for you. But the reality is there's only money if there's a significant health nosedive. And the reason is because the policy is worth essentially what the premiums were paid, but here they lard the loan with so many costs and expenses and interest at an all-in rate of 16.8% that there was $200,000 on top of the premium that was the total amount due on the loan. That's a barrier to interest, excuse me, barrier to entry for any third-party investor unless a material health situation has happened. And as Judge Wood pointed out, in the eligibility criteria for AIG to buy these policies, they weren't picking terminally ill insured. They were hand-selecting them that would live longer than the 25-month contestability period and then continue to live but not be a septenarian, I guess I don't know that word, but to live too long. I see that the time is running low. Let me just address what I think is Wells Fargo's only argument, which is because there was this technical possibility that no one expected to happen, that upon the expiration of the loan, Corwell could somehow reach into his own pocket, pay back that usurious loan, and keep a policy he didn't want, didn't need, and his longtime accountant said he could not realistically pay for. That that technical possibility somehow means that everything was okay and this policy had insurable interest. What they're really saying is that Illinois law allows investors to use seniors as tools to create hundreds and maybe thousands of policies so long as it is theoretically possible that some of those policies at the end might slip through Coventry's fingers. But as the district court correctly recognized, that risk was merely part and parcel of the wager. Suppose we change this transaction just a little. Well, Corwell knows that there is a market for the resale of policies like this, but he secures the policy and puts down the first premium with his own money without having borrowed anything, without having made any arrangement, and then the next day goes out into that market and sells the policy. Is there any problem with that under Illinois law? That's a great question. I believe that is an open question under Illinois law. My friends have suggested that that's controlled by the Hawley case. However, that is not at all what happened in Hawley. I am very well aware. That's why this is called a hypothetical question. I wish you would deal with it. Very well, Judge. The hypothetical is, is there a problem with that under Illinois law? Right. He pays for it without the payback. He fully pays for the first premium, and then the next day he goes out and decides to sell it because he's aware that there's Because he knows there's a market out there. Understood, understood. He's not a dummy. I understand the hypothetical, and thank you for your indulgence. We do not believe that transaction would be supported by insurable interest because the policy would not have been taken out in good faith for a bona fide insurance purpose. Then it sounds to me like you're just disagreeing with Illinois law because I take it as very well established in Illinois law that if you buy a policy on your own life on day one, you can sell it or transfer it on day two, and it now sounds like you don't think Illinois ought to have that policy. Sorry, ought to have that rule, but it does. Well, we may have to respectfully disagree. What I know is that the cases, and they haven't been overruled, require the policy to be taken out in good faith for a bona fide purpose. But so whether Corwell could have done this acting alone, respectfully I understand it's a hypo, that is not this case because of all the facts that Wells Fargo ignores. The third party origination facts, Judge Hamilton, they were involved before the policy was issued. It was Coventry's money. We all agree that there was an elaborate fraud. The question is does Illinois law look through the form to the substance, and I'm trying to get away from the second part of that question by asking whether it would look through the form if somebody simply buys a policy with his own money on day one and then sells it on day two. I thought it was black letter Illinois law that that was permissible, and you're now telling me that you think it's not permissible. Well, what I'm saying is that the case that Wells Fargo cites with Dennis Hawley, I won't go through the facts, but he had that for 19 years before he sold that policy. So I thought maybe you were saying something in between, that the scenario that Judge Easterbrook has painted could be a perfectly legitimate scenario, but you, I thought, were adding nefarious purpose into the equation, which is going to exist sometimes and not exist maybe many other times. Maybe somebody's just figured out a smart way to play with the market. But as long as it's not some evil purpose, whatever that may be. Maybe that's my own shortcoming. I can't see participating in an established market as a nefarious purpose, given that we are capitalists rather than communists. Speak for yourself. Indeed we are, sir. I would agree, Judge Wood. I guess I will say this, Judge Easterbrook. If an insured uses his own money and has actual substantial skin in the game, it's a totally different question. It's a totally different case than the one we have here. I see I have one minute remaining with the court's indulgence. I'd like to move to the premium refund questions and address them. Actually, we have, or at least I have a question that Judge Hamilton asked her adversary, which is, is there any reason why any document in this appellate record should be sealed? There is no such reason. All right. So we have the agreement of the parties. Thank you. Now you can move. Thank you. With my remaining 40 seconds on premium refund, there's two issues here. The judge got the first one right, which is to the extent Wells Fargo has proven an entitlement to restitution, it is limited to what Wells Fargo itself paid. There's no disagreement as to that rule. What Wells Fargo is trying to do is redefine itself. Wells Fargo is not here just as, quote, unquote, Wells Fargo. They're here solely in a representative capacity for VITA. They used to serve as a representative of AIG and of Blackstone entity. To be clear, those three entities, AIG, Blackstone, and VITA, they're competitors. The only thing they have in common is they happen to use the same bank to pay the premiums. And so under that test, that is all they can get back. I see that I'm out of time. May I have an extra minute or two given all the questions? No, I think we understand everybody's position. Very good. Thank you so much. Anything further, Mr. Dikens? Yes, Your Honor. If Your Honors, as you point out, look at the substance of this transaction, you will see that there could not be a wager here under the terms of the loan because Corwell controlled it, and I really want to convey that point. There was no prearranged agreement by AIG or anyone else to buy the policy. What is the evidence that Mr. Corwell made any decisions, for example, about the welcome funds offer? There's no record evidence that Mr. Corwell ever heard about the welcome funds offer, but there is plenty of evidence in the record, Your Honor, that Mr. Corwell was a sophisticated investor who engaged in many of these transactions over the course of his life. He bought five other policies on a recourse basis and had to repay those loans to a local Illinois bank. Just in the 30 seconds I have left, Wells Fargo is entitled to summary judgment for all the premium it paid to Sun Life on this policy. Under Illinois law, to be entitled to unjust premiums here, Wells Fargo has to show that Sun Life is retaining a benefit paid by Wells Fargo to Wells Fargo's detriment. That occurred here, as Mr. Keller has said. Wells Fargo is paid $1.8 million in premium, and that is unjust under the Seebeck and Dickerson cases, because Illinois law requires a refund of premium when a policy is declared void of an issue. Thank you, Your Honors. Thank you very much. The case is taken under advisement.